## Appeal of SCHULZ BAKING CO.

Docket No. 2074. Submitted May 11, 1925. Decided January 28, 1926.

The selling prices of corporate stock immediately after incorporation, *held*, in the circumstances of the appeal, to be a proper basis for measuring the value of property, including good will acquired for stock.

*Alfred H. Coe, C. P. A.*, for the taxpayer.
*Ellis W. Manning, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of deficiences in income and profits tax for the years 1919 and 1920 of $3,488.61, only a portion of which, however, is here in controversy. The only issue presented for our consideration is the elimination by the Commissioner from invested capital of any amount predicated upon the value of good will acquired for stock.

FINDINGS OF FACT.

The taxpayer is a Delaware corporation with its principal place of business at Pottstown, Pa. It has been engaged in the general baking business since its organization on April 14, 1913, when it took over the business which theretofore had been conducted by John L. Schulz, as an individual proprietor.

Schulz began business in Pottstown in 1902. By 1906 his total output amounted to only 2,000 loaves of bread per week. During that year he acquired the right to manufacture and sell "Butter-Nut" bread in Pottstown and vicinity, and by 1908 his business had increased to 17,000 loaves of bread per week. In 1912 the plant was enlarged and shortly thereafter the weekly output was 70,000 loaves. The improvements cost approximately $20,000. From 1912, and after the taxpayer was organized, the business increased steadily, and in 1918 the plant was again enlarged by the construction of two additional ovens.

The taxpayer had an authorized capitalization of $150,000, divided into $75,000 preferred stock and $75,000 common stock—1,500 shares of each at $50 a share.

When the taxpayer was organized the total authorized issue of stock was transferred to Schulz for his plant, equipment, and business, allocated as follows:

Net tangible assets_____ $13,996.16
Formulæ _____ 580.00
Good will_____ 135,423.84
                                                            _____
Total_____ 150,000.00

The amount allocated to formulæ represents the amount of cash paid by Schulz for the formulæ and right to manufacture and sell "Butter-Nut" bread in Pottstown and vicinity.

On April 19, 1913, Schulz turned back into the treasury preferred stock in the amount of $40,000 and common stock in the amount of $10,000. During the year 1913, 121 shares of preferred and 81 shares of common stock were sold from the treasury stock as follows:

| To whom sold. | Preferred stock | Common stock. | Amount received. |
|---|---|---|---|
| Daniel Evans | $250 | $150 | $250 |
| Elmer H. Young | 1,150 | 750 | 1,150 |
| William Wiand | 200 | 100 | 200 |
| George Faber | 1,050 | 700 | 1,050 |
| John Flannery | 600 | 400 | 600 |
| William Reifsnyder | 300 | 150 | 300 |
| James E. Christman | 600 | 550 | 600 |
| William Wiand | 200 | 100 | 200 |
| George Faber | 600 | 450 | 600 |
| Burdan Brothers | 1,050 | 700 | 1,050 |
| Daniel Evans | 50 | None. | 50 |
| | 6,050 | 4,050 | 6,050 |

Of the amount received from these sales, $3,110 was paid in cash, $1,400 in promissory notes, and $1,540 was charged against accounts payable. In each instance, the preferred stock was sold at par and common stock was given as a bonus. These sales were made to willing purchasers who were members of the general public. They were acquainted with the business and knew the amount for which the business was capitalized. In the two cases where stock was accepted by creditors in satisfaction of claims against the taxpayer, the stock was taken by choice of the creditors and not from necessity.

On March 3, 1917, there were outstanding 1,840 shares of stock of a par value of $92,000, of which amount $35,200 was common stock and $56,800 was preferred stock.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on 15 days' notice, pursuant to Rule 50.

### OPINION.

LITTLETON: The only matter presented for determination by this appeal is the amount of the taxpayer's invested capital for the years 1919 and 1920. There is no question concerning the net income for either of these years.

The taxpayer was organized on April 14, 1913, for the purpose of taking over the general baking business, which was owned and operated by John L. Schulz. For the assets of this business, the taxpayer issued its total authorized capital stock amounting to $150,000. This stock was divided into 1,500 shares of preferred stock and a like number of shares of common stock with a par value of $50 a share.

In computing the tax for the years 1919 and 1920, the Commissioner excluded from invested capital the total amount allocated to good will. This action was based on the ground that no satisfactory estimate as to the cash value of good will, as of the date it was exchanged for stock, was adduced. From this determination the taxpayer appealed, claiming that the good will was of value and that the amount thereof should be included in its invested capital.

With reference to the proper method for determining the value of good will, the court, in the case of *Von Au* v. *Magenheimer*, 115 App. Div. 84; 100 N. Y. S. 659, said:

No rigid and unvarying rule can be laid down by the courts in this class of cases. Each must be considered and determined in the light of the facts surrounding and connected with it. Within proper limits the determination of

such question must be left to the jury, but their conclusion must rest upon evidence legitimately tending to establish value and supporting their verdict.

In *Moore* v. *Rawson*, 185 Mass. 264; 70 N. E. 64, the court said:

While no rule can be laid down by which the good will of a trading partnership in all cases can be ascertained and its value fixed with mathematical precision and accuracy, yet, if it be assumed that a firm has been in existence for a time long enough to establish a business sufficiently permanent in character to include not only its customers, but the incidents of locality, and a distinctive name, these advantages constitute a going business enterprise; and it may then be said that the name and what is done under it go together, and a good will exists which forms an asset of commercial value in a winding up between partners. The fact that such an asset may be difficult of appraisement is no legal reason for denying to the retiring partner an appraisal, if it be proved that he is entitled to it. * * * The length of time the firm had been in existence, the nature and character of its business, the fact whether it had been successful or unsuccessful, the average amount of net profits, the probability of the continuance of the business under the same name without competition in any form from a retiring partner, are some of the elements that may enter into such an inquiry.

The valuation of good will is a question of fact and must be determined on the evidence in the record. The evidence presented by the taxpayer in support of its appeal must therefore be considered to determine whether or not the taxpayer has submitted facts sufficient to show the value of the good will as of the date it was acquired for the stock of the corporation. The record discloses that the business was started as an individual enterprise by John L. Schulz in 1902, but that his business did not exceed 2,000 loaves of bread per week until 1906, when he obtained the formulæ to make and sell " Butter-Nut " bread. Within two years after that date his business had increased to 17,000 loaves a week, and in 1912 it became necessary to enlarge the plant. Shortly thereafter the business was more than trebled, the weekly output being 70,000 loaves per week. These facts indicate that the taxpayer acquired a thriving, growing business. They indicate that Schulz had built up a reputation among the people of Pottstown and that the number of customers was both large and constant. They show that the taxpayer, in taking over the business, acquired a value greater than that attributable to the tangible assets. No evidence was submitted showing the profits of the business during the time that it was operated as an individual enterprise, and the facts outlined above are not sufficient for determining the value of the good will of the business. The facts mentioned do show, however, that good will was a large factor in the success of the business.

There is further evidence which shows the sale of stock during the year 1913 immediately after incorporation. On April 19, 1913, five days after the taxpayer corporation was organized, Schulz turned in to the treasury preferred stock in the amount of $40,000 and common

stock in the amount of $10,000, leaving outstanding $35,000 par value of the preferred stock and $65,000 par value of the common stock. During the next few months the taxpayer sold 121 shares of the preferred stock at par and 81 shares of common stock were distributed among the purchasers as a bonus.

The Commissioner rejected this evidence upon the ground, first, that the block of stock sold was so small in proportion to the total left outstanding that the sales furnished no reliable criterion as to the value of the stock issued for property; and, second, that the transactions were subsequent to the organization of the corporation. These sales took place almost immediately after the organization of the taxpayer, and, in view of this fact and the further facts as to the established business existing at the time of the incorporation of the taxpayer, there is little merit in the latter position taken by the Commissioner. The Commissioner's position on the first point rests on the weight to be attributed to the sales in question and to the values which would result mathematically from the application of the price received in these sales to the entire block of stock issued for property—that is, to $35,000 of preferred stock and to $65,000 of common. A further difficulty arises from the fact that the common stock was given as a bonus with the preferred. This, of course, does not mean that bonus stock so given is without value or that preferred stock sold with common as a bonus is sold for par. It does mean that for a block of common and preferred together a certain price is received. In this case $6,000 was received for a block of 201 shares of preferred and common. Upon this basis—that is, upon the basis of $6,000 for 120 shares of preferred and 81 shares of common—$35,000 of preferred would carry with it as a bonus $23,625 common. There having been issued, in effect, for tangible and intangible property, $65,000 of common in addition to the $35,000 of preferred, our next problem is to determine whether any value should be assigned to the remaining lot of common stock. No evidence was submitted showing sales of common stock separately from preferred stock, and, as set forth above, the total stock shown by the evidence to have been sold immediately after the organization of the taxpayer was small in proportion to the total amount of stock issued, particularly to the total amount of common stock issued for property. Under all the circumstances we are of the opinion that no more than $35,000 can be accepted as the proven value of tangible and intangible property issued for stock upon the organization of the taxpayer. Taking from this amount of $35,000 the value of $13,996.16 applicable to tangible property, leaves a value of $21,003.84 for the intangible property paid in for stock, which value of $21,003.84 should be included in computing the taxpayer's invested capital.